E-filing

FILED 08 MAR 17 PM 3:47 RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983

Name Hawthorne Carlos A II
(Last) (First) (Initial)

Prisoner Number K-67900

Institutional Address San Quentin State Prison
San Quentin, CALIF 94974

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CARLOS ANTHONY HAWTHORNE II
(Enter the full name of plaintiff in this action.)

vs.

R.AYERS JR; A.COTA; R.W.FOX; J.PICKETT; D.LEE; T.HOLT; S.ROBINSON; R.CRUZ, Defendent's, in their individual and official Capacities ET.AL
(Enter the full name of the defendant(s) in this action))

Case No. C 08 1473 WHA (PR)
(To be provided by the clerk of court)

COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983

*[All questions on this complaint form must be answered in order for your action to proceed..]*

I. Exhaustion of Administrative Remedies

[**Note:** You must exhaust your administrative remedies before your claim can go forward. The court will dismiss any unexhausted claims.]

A. Place of present confinement San Quentin State Prison "Condemned Row"

B. Is there a grievance procedure in this institution?

YES (✓) NO ( )

C. Did you present the facts in your complaint for review through the grievance procedure?

YES(✓) NO ( )

D. If your answer is YES, list the appeal number and the date and result of the

Log Number: # SQ-07-00778

appeal at each level of review. If you did not pursue a certain level of appeal, explain why.

1. Informal appeal Bypass (See: Exhibit*1)

2. First formal level Bypass (See: Exhibit*1)

3. Second formal level D. Edwards 3-23-07 (See: attachment "A". Exhibit* )

4 Third formal level Number* 07-00778 Aug 17, 2007 by T. Surges, Directors Level appeal decision (denied)

E. Is the last level to which you appealed the highest level of appeal available to you?

YES (✓) NO ( )

F. If you did not present your claim for review through the grievance procedure, explain why.

II. Parties

A. Write your name and your present address. Do the same for additional plaintiffs, if any.

Carlos Anthony Hawthorne II K-67900
San Quentin State Prison
San Quentin, CALIF 94974

B. Write the full name of each defendant, his or her official position, and his or her

place of employment.

Each Defendant, Employee is employed at San Quentin State Prison, San Quentin, CA 94974. See: Complete list of all Defendants on Attached pages titled: "The Defendants"

III.

Statement of Claim Continued on page #1

State here as briefly as possible the facts of your case. Be sure to describe how each defendant is involved and to include dates, when possible. Do not give any legal arguments or cite any cases or statutes. If you have more than one claim, each claim should be set forth in a separate numbered paragraph.

(1) On or about the day of February 1, 2007, the Plaintiff made a personal appearance before a Unit 5, I.C.C. (Institutional Classification Committee), for a Grade "A" program, The Committee consisted of the following defendants, R. Ayers Jr, A. Cota, R.W. Fox, J. Pickett, D. Lee, T. Holt, S. Robinson, R. Cruz.

(2) Plaintiff was previously assigned to a Grade "A" Eastblock Program but was not assigned to a group yard because Defendant (Fox) falsely claimed that the Plaintiff was a member of the "Crips", which has been labled as a disruptive group; by the San Quentin Prison Administration.

(3) Plaintiff then explained to the Defendants that he is a Muslim and IS NOT and HAS NOT ever belonged to a gang or participated in any disruptive group activities. (statement of claim continues on attached) (See 602 at Exhibit #1)

IV. Relief Continued on page #3

Your complaint cannot go forward unless you request specific relief. State briefly exactly what you want the court to do for you. Make no legal arguments; cite no cases or statutes.

Remove Correctional Officer (Fox) from the Committee Panel and

(D) The Plaintiff was then met with an illegal and prejudicial ultimatum by defendants R. Ayers Jr, A. Cota, R. W. Fox, J. Pickett, D. Lee, T. Holt, S. Robinson and R. Cruz, to attend exercise yard (Number #5) or be placed on a Grade "A" Walk-Alone exercise yard. Plaintiff stated that he understood the I.C.C.'s actions and was not in agreement with their recommendations. (See: Exhibit # 4)

(E) Defendants A. Cota, R. W. Fox, J. Pickett and T. Holt began to berate the Plaintiff by falsely claiming that He (The Plaintiff) was using his faith as a sheild to continue the promotion of violence and gang activity within the institution, and again, the Plaintiff explained to the entire panel of Defendants that He wished to return to Exercise Yard (Number #1) as Plaintiff has been assigned to that Exercise Yard for Eight (8) years and Plaintiff has other Muslim Brethren who are also assigned to exercise yard (Number #1) and wished to continue his involvement in other personal litigation. (See: Exhibit #5-6)

(F) The Plaintiff was advised by Defendants, A. Cota, and J. Pickett; that Plaintiff was not going to be allowed to return to exercise yard (Number #1) and was illegally given a choice between Grade "A" Walk-Alone or Exercise yard (#Number #5), in which all of the Defendants conceded with one another and went on to advise the Plaintiff about the Eastblock Housing units "No warning shot" Policy, to which the Plaintiff stated He well understood, and declined the committee's recommendation that is in clear adversity to the Safety and Security policies

of all inmates, staff and the institution because the Plaintiff believed that each of the Defendants were acting in concert and had an ulterior motive, since He (The Plaintiff) has never encountered such a rapacious group of employee's who were seriously determined to place Him on an Exercise Yard that was never personally requested. Exercise Yard (Number *5) is a designated Walk-Alone Group Yard for inmates who are not welcomed on other yards. (See: Exhibit of Memorandum by Former Warden). As a direct result of the Plaintiff's alleged refusal to satisfy the ravenous suggestion(s) of the Defendants; the Plaintiff was forced to suffer being assigned to Grade "A" Walk-Alone for 90 days and subjected to conditions that are inadequate and inhumane, and was deemed Unconstitutional by the courts (See: Lancaster V. Tilton C 79-01630 WHA)

(G) On or about the day of March 12, 2007, the Plaintiff filed a C.D.C. 602; requesting the proper sanitary facilities, because the Grade "A" Walk-Alone yards are constructed onto the side of the building; and had no place to sit, no running water, sink or toilet. The Plaintiff was forced to endure conditions, such as dried urine stains on the walls, the ground and even outside the Walk-Alone cage. Plaintiff was also forced to request a State issue plastic garbage bag, in which to relieve himself, and it not only constitutes an 8th Amendment violation, but also constitutes torture; which is a human rights violation.

(H) On or about the day of April 26, 2007, the Plaintiff made a personal appearance before a Unit 5, I.C.C. for an exercise yard

review, for a consideration of a group yard. The Plaintiff was previously assigned to a Grade "A" EastBlock Program, but was not assigned to a group yard because I.C.C. falsely claimed to have been given the impression that the subject (Plaintiff) would not participate in any other exercise yard program. It was noted that the exercise yard the subject (Plaintiff) was requesting, WAS NOT exclusively made up of "Crip" associates and had returned to a more reintergrated status. Subject (Plaintiff) stated that he could program successfully on any exercise yard, but preferred (Yard #1) as he was on that yard for Eight (8) years previous to being removed, I.C.C. could find "NO REASON" at that time to deny the subject's (Plaintiff's) request, and granted him placement on reintergrated mixed Exercise Yard (Number #1). See: Exhibit #11)

Relief Continued... The Plaintiff is also seeking $10,000 dollars in compensatory damages against each defendant, Jointly and severally. Punitive damages in the amount of $10,000 against each defendant. A Jury trial on all issues triable by Jury. Plaintiff's costs in this suit and any additional relief this court deems Just, proper, and equitable.

Carlos Anthony Hawthorne

Dated: March 12, 2008

Carlos Anthony Hawthorne II

Respectfully Submitted

Carlos A. Hawthorne II #K-67900
San Quentin State Prison
San Quentin, CA 94974

exclude Defendant (Fox) From any and all decision-making procedures or practices. Replace the former and current prison officials who have been and are "acting in concert" with others who are in violation of the Law; and put into place an interim administration committee that is Fair and impartial to the condemned prisoners right to due process under the law. Stop the psychological torture and put an end to the sensory Deprivation.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 12th day of March, 20 08

Carlos Anthony Hawthorne II
(Plaintiff's signature)

"Table of Exhibits"

1) C.D.C. 602 Form

2) Attachment "A"

3) Directors Level Review

4) February 1, 2007 I.C.C. Chronological Report

5) U.C.C. 128 Chrono Dated: 5.13.98

6) U.C.C. 128 Chrono Dated: 1.6.99

7) Exhibit #4

8) #5, #6 (Statement of Claim(s) form Page #1 Line(s) 9-18)

9) Memorandum By J.S. Woodford-Former Warden (Page #4) Also see: Lancaster vs. Tilton (Case No. C79-01630 WHA) (Page #29)

10) C.D.C. 602 on Walk-Alone cage conditions

11) I.C.C. 128 Chrono Dated: 4.26.07

Trust Account Statement Number #1

Trust Account Statement Number #2

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS

# INMATE/PAROLEE APPEAL FORM

CDC 602 (12/87)

Location: Institution/Parole Region 1. SQ 2. ______
Log No. 1. 07-00778 2. ______
Category 2

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

5-EY-133

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| (1) (2) Carlos A. Hawthorne II | K-67900 | 2EY41 | 3-BY-40 |

A. Describe Problem: After being unjustly deprived of his option to return to "integrated" exercise yard #1 by F/capt. R. Fox, this appellant was then met with an unfair and capricious ultimatum by members of the committee; to attend exercise yard #5 or be placed on walk-alone status. Once this prisoner had rightfully refused, he was then unjustifiably placed on walk-alone with Grade "A" privileges; because of an alleged accusation of having ties to a crip gang and being a participant in a disruptive group, according to members of the committee. This prisoner "is not" and "has not" ever been a member of any street gang or disruptive group. The due process clause of the Fourteenth Amendment of the U.S. Constitution provides that "no person may be deprived of liberty without due process of law." This segregation is affecting this prisoners legal affairs.

If you need more space, attach one additional sheet.

B. Action Requested: 1) This prisoner wants to return to his formerly assigned ("intergrated" grade "A" exercise yard #1) 2) To be presented with a complete and legitimate copy of the 114-D lock-up order to document the program change, and a full and complete copy of the 115 regarding the Confidential information with the 1030 form in relation to the incident. 3) Create a General population exercise yard for all grade "A" inmates.

Inmate/Parolee Signature: Carlos Anthony Hawthorne II FEB 26 REC'D Date Submitted: 2-25-07

C. INFORMAL LEVEL (Date Received: ______)

Staff Response: ______

Bypass

Staff Signature: ______ Date Returned to Inmate: ______

D. FORMAL LEVEL

If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Exhibit #1

SS

RECEIVED JUN -1 2007 INMATE APPEALS BRANCH

Signature: ______ Date Submitted: ______

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number: ______

First Level ☐ Granted ☐ P. Granted ☒ Denied ☐ Other

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: FEB 26 2007 Due Date: APR 09 2007

Interviewed by: D Edwards, 3-23-07 Sec a Hachment 'A'

Staff Signature: [signature] Title: CC II Date Completed: 3-24-07

Division Head Approved: Signature: [signature] Title: AW II MAR 29 REC'D Returned Date to Inmate: 3/28/07

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Dissatisfied, 1) this prisoner wishes to return to his formerly assigned (Intergrated grade "A" exercise yard #1) 2) To be presented with a full and complete copy of a legitimate 114-D Lock-up order to document the program change, with a complete copy of the 115 related to the alleged incident and a copy of the 1030 form. 3) This prisoner should be removed from walk-alone status because he's not demonstrating the propensity for violence, but a willingness to continue exhibiting Grade "A" behavior.

Signature: Carlos Anthony Hawthorne II APR 03 REC'D Date Submitted: 4·1·07

Second Level ☐ Granted ☐ P. Granted ☒ Denied ☐ Other

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: APR 03 2007 Due Date: MAY [illegible] 2007

☐ See Attached Letter

Signature: [signature] Date Completed: 5-16-07

Warden/Superintendent Signature: [signature] CDW 5/16/07 MAY 18 REC'D Date Returned to Inmate:

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Dissatisfied, 1) Counselor Edwards claims that condemned inmates are governed by the Thompsons Decree and the Wardens Condemed manual, However the prison administration is not honoring an inmates request to return to the exercise yard that was previously assigned "Before" that inmate was placed into disciplinary detention. The prison I.C.C. is giving condemned inmates who are african-american an ultimatum; to either attend exercise yard #5 or be assigned to walk-alone, under the false claim that so-called street-gang's are maintaining control of the exercise yards, which is simply a fallacy and needs to be severely investigated.

Signature: Carlos Anthony Hawthorne II Date Submitted: 5·29·07

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☐ P. Granted ☒ Denied ☐ Other

☒ See Attached Letter

Date: AUG 17 2007

Attachment "A"
Appeals # 07-00778
Response to Section E

March 23rd, 2007

From: D. Edwards, CCII
East Block Condemn Unit

To: Hawthorne, K67900

RE: Response to First Formal Level of Appeal
Appeal # 07-00778

**Subject was Interviewed on 3/23/07**

Inmate Hawthorne

**Background Information:**

Per your CDCR-602 appeal dated 02/26/2007 you are filing an Appeal requesting you be assigned to Reintegrated Mix #1 Exercise Yard, that you receive a CDCR-114D, and that ICC create a General Population Yard for all Grade A inmates.

**Governing Regulations:**

**Wardens Condemned Manual:**
**Article 1 - Classification Process and Committees**

Sec. 301. Initial Classification Committee.

Grade A: Inmates without a high violence or escape potential who have demonstrated a good disciplinary-free adjustment and are **able to get along safely and peaceably with other inmates** and staff.

Grade B: Inmates with a high escape or violence potential or who are serious disciplinary or management cases. Included are those inmates with a history of escape, in-prison assault, gang affiliation, introduction of contraband, or weapons possession.

Exhibit #2

Sec. 463. Behavior **[illegible] 10 will be prepared by any staff member who h[illegible] report about any inmate. Such data may in[illegible]ut and erratic attitudes, behavior and social** [illegible]es Violation Report will be prepared when appro[illegible] be assigned prior to CDC-

115 hearings for all vision, hearing and speech impaired inmates, as well as inmates assigned to CCCMS or EOP programs.

**Governing Regulations:**

**DOM:**

**62010.4.2.1 Adverse Effect**
Substantially, adverse effects are:
□ Involuntary removal from an assigned program.

**62010.8.2 ICC Authority**
The ICC is delegated the primary authority for all classification actions within the institution.
**62010.8.3 Initial Classification Committee**
Each institution shall establish an initial classification committee to review and initiate a suitable program for each inmate within 14 days after arrival at the
institution.
**62010.9 Classification Committee Responsibility Due Process**
Each classification committee shall:

□ Make decisions based on evaluation of available information and mutual agreement of the committee members.
□ Inform the inmate of the decision.

**CCR Title 15**
Article 10. Classification
**3375. Classification Process.**

**(D) The inmate's stated preferred action, the reasons for the preference, and his/her agreement or disagreement with the committee**

**Discussion:**

Hawthorne was in good physical and mental Health. He was given an opportunity to review his 602 and supplemental information. He stated he understood the issues and did not need a Staff Assistant. During the interview, the Subject was allowed to present and discuss his issues. The interview was conducted while the Appellant was occupying a holding cage in East Block. Prior to an in-depth discussion, this reviewer attempted to clarify the issues of the 602 as the Subject exceeded the Appeals process by requesting three separate and somewhat non-related actions. The Appellants main grievance as that he was not granted to be assigned to Grade A Reintegrated Mix #1 Exercise yard during his 2/1/07 ICC hearing.

The Subject was first advised that pursuant to Thompson and the Wardens Condemned Manual, Condemned inmates are not subject to placement into Administrative Segregation, which is the premise of the CDCR-114D. Hence, the Subject will never receive a 114D while on Condemned status at San Quentin. Only inmates confined to the Director of the Department of Corrections and Rehabilitation are subject to 114Ds'. Subject has been remanded to the custody of the Warden at San Quentin State Prison.

Second, this reviewer discussed the yard options available to Condemned inmates:

Reintegrated Mix, Controlled Compatible Black/Northern Hispanic, Controlled Compatible White/Southern Hispanic, and Walk Alone.

Subject was advised that in the Wardens condemned Manual and the Thompson Consent, the Appellants request for a "General Population exercise yard for all Grade A inmates" has been met and implemented.

Appellant responded to this reviewer that it was his purpose to go to Yard #1 because his Law Library study group and Muslim friends are on that Yard, and he wants to be able to co-mingle with them when on the exercise yard. Subject was admonished that this was not the reason stated to ICC on 2/1/07 for his request to be placed onto Yard #1. If in fact that this was a new approach to requesting Yard #1, this reviewer suggested that the Appellant make those facts known at his next scheduled ICC hearing. The Appellant felt that since he had done a good program on Yard #1, which is the yard he should return to. The Appellant did not indicate to this reviewer that he was ready and willing to accept another yard assignment.

In noting the CDCR-128G of 2/1/07, it was Committee's decision not to place the Subject on Yard #1 due to his stated inability , or acceptance of another yard assignment. Subject was advised that under both Thompson and the Wardens Condemned Manual, the criterion for Grade A is that the inmate must be 'compatible' with all other inmates. In that , the Subject would and should be compatible with any other inmate on any of the other Reintegrated mixed exercise yard. The Appellant's reluctance and or refusal to participate in one of the other five exercise yard options is indicative of his inability to program with other inmates and cause for failure to met the expectations of a Grade A inmate.

Subject is advised at this juncture that he should evaluate his exercise yard options and substantiate his request for placement to a Reintegrated Mix Yard at his next scheduled ICC or UCC hearing.

**Decision:** After a review of previous ICC and UCC actions, a review of this Appeal and a productive interview with the Appellant, this Reviewer can find no sustainable evidence brought forth by the Appellant that would be cause to grant this Appeal.

**Appeal SQ 07-00778 is Denied in its entirety.**

D. Edwards

CC-II D. Edwards, Special Unit, Condemned
San Quentin State Prison

Noted
Denied
3/28/07

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

AUG 17 2007

Date:

In re: Carlos Hawthorne, K67900
California State Prison, San Quentin
San Quentin, CA 94964

IAB Case No.: 0615895 Local Log No.: SQ-07-00778

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner A. F. Caton, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I APPELLANT'S ARGUMENT:** It is the appellant's position that a classification committee at San Quentin State Prison (SQ) inappropriately removed him from the Reintegrated Mix (RM) Yard #1. The appellant states that staff labeled him as member of the "Crips" disruptive group and the classification committee gave him a choice between assignments to RM Yard #5 or "walk-alone" status. The appellant states that he refused yard reassignment and the classification committee placed him on "walk-alone" status. The appellant contends that he was deprived of liberty without due process and requests to be returned to his previous yard assignment and to be given a complete copy of his CDC Form 114D, Administrative Segregation Unit Placement Notice, documenting the program change. He also requests a copy of a CDC Form 115, Rules Violation Report (RVR) and CDC Form 1030, Confidential Information Disclosure Form, documenting confidential information about his involvement with the Crips and for the institution to establish a general inmate population exercise yard for "Grade A" inmates.

**II SECOND LEVEL'S DECISION:** The reviewer found that the appellant is a condemned inmate and the CDC 114 process is not used for condemned inmates because they are not placed in administrative segregation. The Second Level of Review (SLR) explained that the criteria for "Grade A" requires inmates to be compatible with other inmates and the Institution Classification Committee (ICC) became concerned about the appellant's refusal to participate in yard activities with inmates other than those in Yard #1; therefore, the ICC assigned the appellant to a "walk-alone" yard. The SLR pointed out that the appellant has not been issued a RVR concerning his rejection of other yards. The SLR also explained that "Grade A" RM yards are general inmate population yards for condemned.

**III DIRECTOR'S LEVEL DECISION:** Appeal is denied.

**A. FINDINGS:** Pursuant to California Code of Regulations, Title 15, Section (CCR) 3372, all custody determinations regarding inmates must be made through the classification committee process. As a "Grade A" inmate, the appellant is expected to be compatible with other inmates; therefore, his refusal to accept assignment to other integrated yards is cause for concern. According to CDC Form 128G, Classification Chrono, dated April 26, 2007, the ICC reassigned the appellant to "Grade A" RM Yard #1; thus the institution ultimately granted his request. There is no need for relief at the Director's Level of Review.

**B. BASIS FOR THE DECISION:**
CCR: 3270, 3272, 3342, 3375

**C. ORDER:** No changes or modifications are required by the Institution.

Exhibit #3

CARLOS HAWTHORNE, K67900
CASE NO. 0615895
PAGE 2

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc: Warden, SQ
Appeals Coordinator, SQ

State of California Department of Corrections and Rehabilitation

# Memorandum

Date: May 16, 2007

To: INMATE HAWTHORNE, K67900
California State Prison, San Quentin

Subject: SECOND LEVEL APPEAL RESPONSE
LOG NO.: SQ 07-778

APPEAL ISSUE: CUSTODY/CLASS

ISSUE:

Whether or not the appellant was deprived of his option to attending his formerly assigned re-integrated exercise yard #1 for the condemned population.

FINDINGS I

The appellant filing this appeal alleges that he is being deprived of attending his requested exercise yard. In review of section "B", appellant requests multiple remedies to include a copy of the CDCR 114D lock up order; a copy of the CDCR 115; CDC 1030 forms; and the creation of a general population exercise yard for all grade inmates.

FINDINGS II

INTERVIEWED BY: D. EDWARDS, CORRECTIONAL COUNSELOR II

The first level reviewer denied the appellant's appeal and request for a CDCR 114-D lock up order due to the appellant not being in Administrative Segregation. The appellant's request for placement of the re-integrated mixed exercise yard #1 was denied due to the appellant's case being reviewed in the Institutional Classification Committee (ICC) on February 1, 2007 and discussing his exercise yard placement. ICC elected not to assign the appellant to the re-integrated mixed #1 exercise yard due the appellant's stated inability of not accepting placement on another exercise yard.

REGULATIONS: The rules governing this issue are:

**California Code of Regulations, Title 15, Section (CCR) 3270. Security General Policy.**

**Enomoto v. Thompson Consent Decree.**

**CCR 3375. Classification Process.**

DETERMINATION OF ISSUES:

After review of the available documents, arguments having been presented, as well as referenced regulations, appellant's appeal has been thoroughly considered. Appellant is advised that a thorough inquiry was conducted into his concerns. The Second Level reviewer spoke with C. Grant, Correctional Counselor I, reviewed the central file, the Thompson Consent Decree, Condemned Manual, and exercise yard policy. The following information and facts were determined during this inquiry:

Review of Appellant's central file revealed the appellant appeared in ICC on February 1, 2007 at which time committee considered an exercise yard placement. The appellant refused to attend any other exercise yard except the Grade A reintegrated mixed #1 exercise yard. In accordance with the Thompson Decree, Grade A inmates are condemned inmates, who "are able to get along safely and peaceably with other inmates and staff." The appellant's inability to get along with other Grade A inmates on other exercise yards and his persistence to be assigned to the reintegrated mixed exercise yard #1 concerned the ICC. ICC elected not to assign the appellant to the yard he was requesting. The appellant refused to select another yard and as a result ICC had no other alternative but to assign him to the Grade A Walk Alone Yard. The ICC decision and the appellant's yard assignment are within ICC discretion and correctional judgement. The appellant requests a general population exercise yard for all Grade A inmates. There is currently five exercise yards for Grade A inmates and several Walk Alone Yards.

The appellant requested a CDCR 114-D lock up order however; the appellant is not in Administrative Segregation and is housed at San Quentin as a condemned inmate. The issuance of a CDC 114-D Lock Up Order does not apply to the appellant. The appellant was not issued a RVR CDCR 115 concerning his exercise yard.

Upon review of the documentation submitted, it is determined that the appellant's allegations have been thoroughly reviewed and evaluated at the First Level of Review. The documentation and arguments presented are persuasive that the appellant has not supported his appeal issue with sufficient evidence or facts to warrant a modification of the First Level Response. Based on the submitted documentation, by both the appellant and first level reviewer, as well as discussions, this reviewer finds that the appellant's issues have been duly addressed. The Second Level Response and the decision reached are based upon a reasonable penological interest. Therefore, based on the information received and reviewed the appellant's appeal is denied.

DECISION:

Based on the above review, appellant's appeal is denied. The appellant is advised that this issue may be submitted for a Director's Level of Review if desired.

**ROBERT L. AYERS JR., WARDEN**
California State Prison, San Quentin

**NAME:** Hawthorne **NUMBER:** K67900 **HOUSING:** 2-EY-054S
**CUSTODY:** Max **CS:**59 **WG/PG:**D2/D
**ASSIGNMENT:** Grade A East Block
**YARD ASSIGNMENT:** Gr A EB Walk Alone Yard

**NEXT COMMITTEE: 120 DAYS**

**Action: Grant Grade A Program, Assign to Grade A Walk Alone Exercise Yard**

**Committee Discussion:** Inmate Hawthorne made a personal appearance before Unit V, ICC for a Program Review. Hawthorne was previously referred to ICC by UCC for a program review for a Grade A Program. Dr. T. Phillips, Staff Psychologist, stated that Hawthorne was a participant in the MHSDS program at the CCCMS level of care, but that there were no mental health issues at this time. Hawthorne stated he received 72 hours prior notice of this hearing, understood why he was appearing, and could comprehend today's hearing proceedings. A staff assistant, CCI L. Carrillo, was assigned for this hearing, but ICC has determined a Staff Assistant is not necessary for future hearings. Hawthorne stated he had no Reasonable Accommodation issues, was in good health and ready to proceed with today's hearing.

Subject was previously placed into the Condemned Grade B Program and Walk Alone Yard due to a CDCR-115. Subject was seen by UCC on 01/25/07 and was evaluated and referred to ICC for Grade A Program consideration. ICC reviewed the Subject's Central File in regards to his current behavior and meeting the criteria for Grade A per Thompson Decree and the Wardens Manuel. Unit Staff have indicated the Subject is programming positively and has not been a management problem. Subject was admonished as to his behavior expectations if granted Grade A. The East Block Housing Program was discussed with the Subject. After careful consideration and evaluation by all committee members, it was the consensus of ICC members to grant Hawthorne Grade A status. ICC has reviewed the CDCR 812, 812C, Disciplinary Section, Confidential and General Chronos sections of the C-file and finds no history of predatory or assaultive behavior towards inmates. Enemy concerns were not noted and there was no documented gang activity that would impact Exercise Yard placement. Subject requested Exercise Yard #1 and stated he could not go to another yard except for Yard #1. Subject meets the criteria for other Reintegrated exercise yards, yet refused to program on any other yard. Based on the Subject's refusal to program on other RM Yards, ICC elects to place the Subject on Walk Alone Yard. Subject was advised of the East Block Housing Units' "No warning Shot" policy, to which the Subject stated he understood.

**Committee Action:** After considering all case factors, ICC elects to retain Hawthorne in **East Block** at **Grade A**, continue WG/PG D2/D, and place him on **Grade A Walk Alone Exercise Yard.** Hawthorne stated he understood today's ICC actions and was not in agreement with their recommendation. Subject was advised of his right to appeal any and all of ICC's actions or decisions. This case will be re-evaluated in **120 days** by UCC as per normal program.

**Committee Members:** D. Dacanay, Chief Deputy Warden, R. Fox, Facility Captain, D. Edwards, CCII, Unit Lt. D. Cahayla, Dr. T. Phillips, Staff Psych.

D. Dacanay, Chief Deputy Warden
Chairperson

D. Edwards, CCII
Recorder

**DATE:**2/01/07 **Classification:** ICC **San Quentin, SP**
**128G**

Exhibit #4

No: K-67900 Name: HAWTHORN CDC 128G (Rev. 2/69)
Assignment: CONDEMNED GRADE-A PROGRAM Custody: MAX A
CS: 59. Parole date: CONDEMNED WG/PG: D2/D Next classification: 9-98

HAWTHORNE made a personal appearance before the Unit III, UCC this date for his 120 day program review. At this time, HAWTHORNE stated to Committee that his program is O.K., but subject requested to be moved to Yard-I to be near a mentor, Marshall (C-68800) housed in 1 East Bay 62. Subject was informed that Yard-I is currently for mellow older inmates. Therefore, based upon a review of all case factors, and because subject is experiencing no problems on his current yard assignment, Committee elects to continue HAWTHORNE in his present program as Grade-A Condemned on the Grade-A Exercise Yard-III. HAWTHORNE was informed of his right to appeal Committee's decision, to which he indicated he understood and had no questions. HAWTHORNE's next appearance before this Committee will be during 9-98.

COMMITTEE MEMBERS: R. CHRAFT, CCI
M. PEREZ, LT

R. BRAU, FC (A)
CHAIRPERSON

T. KLYCE, CCI
RECORDER/jac

Date: 5-13-98 Classification: UCC Inst: SQ

Exhibit #5

Name: HAWTHORNE Number: K67900 CDC 128G (Rev. 2/69)

Custody: MAX A
WG/PG: D2/D
PROGRAM REVIEW

Assignment: GRADE A CONDEMNED
CS:59
YARD: CHANGE TO COND. GRADE A R/M 1 YD E/B AT I/M REQUEST

Subject appeared before Unit III, UCC, this date for a 120 day program review. Subject stated that he was satisfied with his current program with one exception. He stated that he has requested on several occasions to be placed on Yard R/M #1. Subject stated that he has no enemies and that he wants to go to yard #1 because there are more Muslims on yard 1 and because he thinks there are some inmates who may be able to help him with his legal work. UCC action of this date elects to grant Subject's request and move him to Grade A Condemned R/M #1 yard. Subject was counseled by Committee Chairperson S. Petrakis, FC, not to involve himself in any problems on yard #1, or he could be facing Grade B for a long time. Subject stated that he would do his best to continue his program of disciplinary free behavior. Subject was informed of committee's decision and his right to appeal to which he indicated he understood and had no further questions. Next UCC is scheduled in 120 days.

Committee members:

S. PETRAKIS, FC, Chairperson G. FULLER, LT. P. JOHNSTON, CCII

T. KLYCE, CCI, Recorder

1/6/99 UNIT III UCC CSP SQ

Exhibit #6



State of California Department of Corrections San Quentin State Prison

# Memorandum

Memorandum by J.S. Woodford- Former Warden See: Page #4

Date: May 12, 2000

To: Roderick Q. Hickman
Regional Administrator, North (A)
Institutions Division

Subject: **SAN QUENTIN'S CONDEMNED VISITING PROGRAM**

I am forwarding a proposal to alter San Quentin's Condemned Visiting Program to Restrained Contact visiting in keeping with the assigned Maximum custody of Condemned Inmates.

## BACKGROUND

As you know, on Friday March 31, 2000, a State Of Emergency was initiated at San Quentin in response to a stabbing assault involving two condemned inmates in the East Block Visiting Room. This stabbing occurred in the presence of visitors including children. Rolling Sixties Crip member Elliot, E-30362 smuggled a 3 ½ inch plastic weapon into the visiting room and stabbed old time Blue Note Crip member Ross, C-58000 over an act of disrespect that occurred in June of 1998.

Pepper spray was utilized to quell the incident but the resulting contamination forced an immediate need to evacuate the visiting room. Emergency procedures were initiated to evacuate the inmates first and assure accountability before the visitors were processed out. This security requirement forced the visitors including those with potentially heightened sensitivity to pepper spray to spend additional time in the contaminated visiting room. Fortunately, no lasting injuries resulted.

Obviously, this situation could have resulted in much more serious repercussions. Two officers armed with .38 caliber revolvers observe the visiting room from control booths. In a case where imminent death or great bodily injury became obvious, one of the officers might have elected to use a deadly force option in the presence of visitors. One of the visitors which included children might have had adverse effects from the use of pepper spray. Absent good procedures, an inmate might be evacuated to the outside with the visitors and affect an escape attempt.

The 271 inmates assigned to the East Block Grade A program all attend one of three yards titled yards 1, 2, and 3 integrated yards. The North Segregation inmates have access to their own yards on the roof of North Block. The 92 inmates assigned as Grade A Walk Alone are assigned to Yards 4 and 5 entitled Walk Alone Group yards. Yard 4 is essentially a Sensitive Needs yard based on heinous crime, notoriety, or drop out status. Yard 5 consists of 18 White and Southern Mexican inmates who have not been accepted on the other Grade A integrated yards.

The Grade B inmates in East Block and the Adjustment Center are all assigned to departmentally approved Controlled Compatible, Integrated, or Walk Alone yards.

**RESOLUTION**

Since the stabbing attack occurred on March 31, 2000, a number of steps have been taken to address the repercussions. Initially, the entire Grade A visiting program was suspended. The State of Emergency included total lockdown of all Grade A exercise programs. The East Block was thoroughly searched to ensure that no weapons were secreted that might be used against staff. Interview teams were established and the entire Grade A population of 433 inmates was interviewed using patterned questions.

The results of the patterned questions are revealing. For years, there has been tacit agreement by staff and inmates that the East Block Condemned contact visiting program is absolutely "neutral" territory and that no Condemned inmates would jeopardize the program by any misbehavior in the visiting room. While the majority of inmates interviewed still maintain that this neutrality still exists, 14% report that neutrality in the visiting room never did exist, and 4% feel that it still exists to some extent.

A small number of inmates reported during interview and later provided documentation of their concern that the fault lies with management of the Condemned Program over the last ten years. It is their feeling that the definition of Grade A, Grade B, and Walk Alone provided in the Thompson Consent Decree has been ignored by staff and known gang members have been classified as Grade A. Exhibit # 9

Page #4

See: Highlighted section ABOVE

In truth, although there are [illegible] ng members classified as Grade A, there are a large [illegible] gang affiliates assigned based on no recent discipl[illegible] history, etc. Among this group are the various Crip [illegible] caused problems in the visiting room. There is evi[illegible] aligned with the Bloods

Our liability increases when it is considered that all Grade A inmates who use the contact visiting room are classified as Maximum custody. No where else in the State Prison system are Maximum custody inmates allowed contact visiting. There are 73 inmates classified as Grade A Walk Alone who have been allowed to visit with the rest of the Grade A population. Many of these are our highest notoriety cases with numerous enemy concerns.

It is also the case that our staff is required to be in direct contact with unrestrained Maximum custody inmates. In the East Block Visiting Room, we position three correctional officers in the room with the unrestrained Condemned Maximum A custody inmates and their visitors. The Booth officers who control egress and ingress by inmates and visitors are armed with .38 caliber revolvers.

The incident that occurred on March 31 is not an isolated incident. On February 26, 1990, Condemned Grade A Inmate Kirkpatrick, C-91406, stabbed his attorney George Mertens, while on a legal visit in the East Block Visiting Room.

On December 21, 1991 Inmate Cox, D-29801, the leader of the Rolling 60s Crip faction along with Crip member Williams, D-62980 attempted to intimidate and threaten Correctional Sergeant B. A. Christensen by their actions in the East Block Visiting Room. The inmates were, by policy, unrestrained at the time. Please note that Cox is the leader of the faction to which Elliot in the instant case belongs.

On October 10, 1996, Inmate Jackson, E-20700 bit his visitor, Kisha Holden, on the nose and struck her four times in the head and face with his fist. Ms. Holden was bleeding profusely from her nose and appeared incoherent. Ms. Holden stated that Jackson wanted her to take something out of the visiting room and she had refused. Jackson was searched and found to be in possession of marijuana.

## THE CONDEMNED POPULATION

At the time of this incident, The Condemned population consisted of the following groups of inmates:

| INMATE GROUP | NUMBER |
|---|---|
| GRADE A EAST BLOCK | 271 |
| GRADE A NORTH SEG | 68 |
| X GRADE A WALK ALONE | 92 |
| GRADE B EAST BLOCK | 34 |
| GRADE B ADJUSTMENT CENTER | 82 |
| TOTAL | 547 |

were instrumental in driving all the Southern Hispanic inmates off the Grade A yards in June of 1998.

The issue of Gangs controlling the yards was addressed but not confirmed in interviews. 80% of the inmates report that the existing yard structure has no problems. 5% claim that the gangs control the yards and should be banned from Grade A. The remaining inmates either don't know or don't go to the yard.

When asked whether or not the yards are integrated or controlled compatible, the inmates mostly avoided the question and stated there are no problems. A few very vocally identified specific problems: "Yards 1, 2, and 3 are controlled by gangs. Yard 3 has Bloods, yard 2 has rolling 60 Crips." Yard 5 is Southern Mexican/AB. The growth of the Condemned population coupled with the small yards resulted in inmates being assigned to yards based on compatibility. The yards, with the exception of the Grade A Southern Hispanic yard, remain racially integrated, however they do not resemble a general population yard as was the original intent of the Thompson Consent Decree. There is known friction between the various yard groups.

Complicating this issue is the fact that tracking enemies and gang affiliations on the CDC 812 has not been a high priority in the Condemned Program because of the small size of the population and the degree to which the staff have been familiar with the individual inmates. The Condemned population continues to grow at a rate of 3 a month or 36 a year. The file reviews being conducted in conjunction with this incident are addressing the need to update the CDC 812s.

## THE THOMPSON CONSENT DECREE

While the contact visiting program predates the Thompson Consent Decree, the decree delineates what kind of visiting program was envisioned by the Court and agreed to by the Department:

VII. Visiting:

1. Grade A inmates will be eligible for contact visits Wednesday through Monday in the visiting area now used by inmates housed in SHU III. Visitor eligibility shall be determined on the same basis as exists for the general prison population. Although defendants cannot guarantee a minimum number of visits per month, defendants agree to make good faith efforts to maximize visiting opportunities.

2. Facilities for such visiting are to be shared equal by the two units.

3. A bassinet will be provided.

4. This decree does not address or decide the question of so-called conjugal/trailer/family visiting. Any position and/or rights of either plaintiffs or defendants are expressly reserved and are unaffected by this decree.

5. Defendants will provide screen, or a suitable substitute, on two sides of the visiting rooms to be used for contact visiting, between those rooms and the general visiting area.

6. Consideration shall be given, in scheduling visits, to the number of visits an inmate receives and the distance visitors must travel.

7. Visits are by appointment for a minimum of two and one-half hours, subject to space availability. Longer minimum visits may be obtained by prior arrangement in the case of those visitors who must travel over 200 miles. Maximum length of visit is subject to space availability.

At the time of the decree, the East Block Visiting Room had not been built and the Department elected to construct Plexiglas booths in the main visiting room. In this situation, the inmate had contact visits with visitors, but they were not in unrestrained contact with staff or other inmates. Hence, Thompson does not require contact with staff or other inmates, only with visitors. As the Condemned population grew, the plexiglas booths were abandoned with the construction of the East Block Visiting Room.

## LEGAL STATUS

The Attorney General's Office has recommended that we consider requesting a modification to the Thompson Consent Decree.

San Quentin has received numerous complaints from the attorneys of the condemned regarding the inadequate visiting accommodations as a result of the existing non-contact visiting program. The attorneys are demanding contact visits. It is certain that litigation will be initiated with regard to attorney access to Condemned clients. We are taking steps to increase the availability of non-contact visiting booths with new privacy screens in order to meet some of the concerns.

## CURRENT VISITING PROGRAM

On April 20, 2000, the total suspension of visiting was lifted and a non-contact visiting policy was adopted. The existing non-contact visiting booths in the East Block Visiting Room are utilized. These facilities are shared with the Administrative Segregation inmates and Grade B inmates assigned to East Block. Under current procedures, inmates are scheduled by appointment for 90 minute visits. Each of the 6 existing booths can accommodate 4 scheduled

visits per day for a total of 24 visits per day. A Warden's Bulletin was issued on April 14, 2000 detailing these new procedures for inmates and visitors.

Prior to the incident, the East Block Visiting Room averaged 55 visits per day in combination of Grade A, Grade B, and Ad Seg. A high of 75 visits occurred on March 12, 2000, a Sunday, and a low of 49 visits was encountered on March 4, 2000, a Saturday. It is clear that the existing facilities will not be able to accommodate the number of visitors expected. The Condemned population continues to grow by an average of 36 inmates a year.

**PROPOSAL**

Attached you will find some preliminary drawings for a proposed retrofit to the East Block Visiting Room to add 20 new Restrained Contact visiting booths to the former contact visiting area. Each booth would measure four feet long allowing space for several visitors. These Restrained Contact booths would be constructed in a U-shape in the center of the East Block Visiting Room. The inside of the U would contain the inmates who would be in standard waist restraints. When seated in the booth, he would be padlocked to a chain secured to the booth wall. A mechanical quick release mechanism could be incorporated which would release the chain from the booth wall to allow quick evacuation in an emergency situation.

The outside of the U-shape would contain the standard plastic chairs used by visitors, the restroom facilities, and the vending machines. The inmate and visitors would sit face to face across a table with an eight-inch high barrier. The inmate would be unable to lift himself from his stool due to the chain padlocked to his waist restraint.

Attached design and scope of work can be accomplished immediately through a redirected Minor Capitol Outlay. It is anticipated that the cost will be approximately $160,540.00.

These new booths would provide up to 80 visits per visiting day which would be adequate for the immediate future provided that 90 minute scheduled visits are acceptable. Note that Thompson specifies two and one half-hours subject to space availability. If we were to provide two and one half hours, 20 booths would be inadequate to sustain the existing level of visiting in a very short time.

A less viable alternative exists in a return to use of Contact Visiting units similar to the original Plexiglas design. The East Block could be retrofitted with these individual Contact Visiting units constructed either of Plexiglas or expanded metal. Essentially these would be oversize holding cells with a small table and stools mounted into the floor. This option is less feasible due to the smaller

number of units that could be installed, the greater cost, the difficulty in evacuating the building, and the lack of safety provided to the visitors.

I will continue a State of Emergency for the Condemned Grade A population while the Department of Corrections studies this issue. San Quentin staff continue to review all Central Files. This has proven to be a slow process with an expected completion date of June 1, 2000. The purpose of the C-file review is to determine gang status and enemy concerns.

Should you or your staff have need for further information please let me know or your staff can direct inquiries to contact person Dewey Wooten, Associate Warden, Unit III, at (415) 455-5037.

J. S. Woodford
Warden, (A)
San Quentin State Prison

**7. Inadequacy of the Grade A Individual Exercise Yards**

The IEYs for Grade A prisoners in East Block do not constitute adequate exercise areas as required by the Consent Decree. Fama Decl., Ex. 10, at § V.B, added by Monitor's Sixth Report at 24 ("adequate" exercise areas required). There are just three small cages for the use of approximately 45 prisoners. There are no exercise supplies or equipment in these cages, nor is there any place to sit. If an inmate wishes to sit during his yard period, he must do so on the floor of the cage, regardless of the weather or the moisture on the floor. These IEYs are not equipped with a shower, sink, or even a toilet. Fama Decl., Ex. 2 at 92:19-97:8; Ex.4 at 31:2-22, 33:22-38:5. Once a prisoner gets the attention of a correctional officer to escort him off the yard to use the restroom, he cannot then return to the yard. Fama Decl., Ex. 4 at 65:9-24. Facility Captain Fox acknowledges that the situation of leaving inmates out on the yard for an "extended period of time" without a toilet is problematic.[45] Fama Decl., Ex. 2 at 94:22-95:22.

---

is no plan in place to permanently fix them. Facility Captain Fox has never discussed with San Quentin's plant operations a long-term solution to those "[p]roblems with the gates not working" that come up on a regular monthly basis. Fama Decl., Ex. 2 at 85:23-87:3. Indeed, Warden Ayers testified that the facility's budget does not allow for those repairs necessary to actually fix the persistent maintenance problems on the exercise yards. Instead, San Quentin currently only has the money to conduct "emergency repairs" as the same problems – predictably – arise time and again. Fama Decl., Ex. 1 at 24:3-14. However, the money even for these "emergency repairs" might not be available for long. Warden Ayers testified that his "pilot program" for the repair of the 17 IEYs in the Adjustment Center will "inhibit [his] ability to do emergency repairs . . . [t]o the physical plan of the prison[.]" *Id.* at 30:25-31:15. This would certainly mean that the persistent maintenance issues would shut down the yards more frequently and/or for longer periods of time.

While Warden Ayers stated that since the fall, the group yards have been shut down less frequently due to maintenance problems, the record reflects that this is not so. Fama Decl., Ex. 1 at 21:23-22:3. The East Block yards were shut down due to maintenance problems a total of eight times in February 2007; twice in January 2007; five times in December 2006; four times in November 2006; and five times in October 2006. *See* Fama Decl., Ex.18 at SQ 04984 (Feb. 2007); SQ 04987 (Jan. 2007); SQ 00670 (Dec. 2006); SQ 00276 (Nov. 2006); Ex. 2 at 121:17-128:8 (Dec. 2006). If anything, these numbers indicate that the yards are being shut down more rather than less frequently due to maintenance problems.

[45] Because of the abysmal conditions of these yards, it is not uncommon for prisoners assigned to Grade A IEYs refuse to go out to yard. *See* Fama Decl., Ex. 4 at 43:20-24, 45:1-3. For instance, one condemned prisoner has long refused use of these yards because his diabetes causes him to urinate frequently and the yards are not equipped with a toilet. Correctional staff

Page* 29 Lancaster V. Tilton

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region 1. SQ 2.

Log No. 1. 07-00779 2.

Category 2

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Carlos A. Hawthorne | K-67900 | | 3-EX-40 5C113 |

A. Describe Problem: This prisoner is being deprived of basic Human needs, such as sanitary toilet facilities, shelter from bad weather i.e. Heavy Rain, Thunderstorms and lightening. He is being exposed to poor conditions that can cause injury and personal discomfort alone. These conditions are inadequate, inhumane and freakishly disturbing. Because these so-called Grade "A" walk-alone yards are not fit for recreational activities; it is more than likely that this appellant can seriously injure himself during an epileptic episode (Grandma Seizure), He will be out of reach of an inmate or anyone who can provide enough medical attention to him; until he can recover and recieve the proper medical assistance - that will prevent a wrongful death.

If you need more space, attach one additional sheet.

B. Action Requested: 1) This appellant wishes to be placed back onto his formerly assigned "intergrated" exercise yard #1. 2) This prisoner wants a sink, Toilet, running water; with a shower installed in each walk-alone Grade "A" facility. 3) This prisoner wants the Grade "A" walk alone facilities to be re-constructed with exercise equipment and as much sunlight as the larger Grade "A" yards.

Inmate/Parolee Signature: Carlos Anthony Hawthorne FEB 26 REC'D Date Submitted: 2-20-07

C. INFORMAL LEVEL (Date Received: )

Staff Response:

Bypass

RECEIVED MAY 11 2007 INMATE APPEALS BRANCH

Staff Signature: Date Returned to Inmate:

Exhibit #10

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supportir[...] stigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coo[...] of receipt of response.

SS

Signature: Date Submitted:

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

First Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other ____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: FEB 26 2007 Due Date: APR 09 2007

Interviewed by: SEE ATTACHMENT

Staff Signature: [signature] Title: SGT Date Completed: 3-7-07

Division Head Approved: Signature: [signature] Title: AW II MAR 19 REC'D Returned to Inmate: 3/16/07

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Dissatisfied, 1) This appellant wishes to be placed back onto his formerly assigned "intergrated" exercise Yard #1. 2) This prisoner wants a sink, Toilet, running water; with a shower installed in each walk-alone Grade "A" facility. 3) This prisoner wants the Grade "A" walk-alone facilities to be re-constructed with exercise equipment and as much sunlight as the larger Grade "A" Yards. Appellant wants an investigation and photo's taken.

Signature: Carlos Anthony Hawthorne II MAR 23 REC'D Date Submitted: 3·20·07

Second Level ☐ Granted ☒ P. Granted ☐ Denied ☐ Other ____

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: MAR 23 2007 Due Date: APR 20 2007

☐ See Attached Letter

Signature: [signature] APR 25 REC'D Date Completed: 4·23·07

Warden/Superintendent Signature: [signature] Date Returned to Inmate: ____

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Dissatisfied, This prisoner wishes to have the Grade "A" walk alone facility's examined by the Director because they are built into the side of the Unit without a sink, toilet, running water or shower and any inmate who's placed into these walk alone facilities "cannot" use sanitary toilet facilities and instead "are" forced to relieve themselves in plastic bags, and cannot wash their hands afterwards. This prisoner was given an administrative ultimatum to attend a specific exercise yard (Number #5) in order to satisfy members of the Committee which is unfair. The unsafe and inhumane facilities must be shut down. Thank You.

Signature: Carlos Anthony Hawthorne II Date Submitted: 5·8·07

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☐ P. Granted ☒ Denied ☐ Other ____

☒ See Attached Letter

Date: AUG 24 2007

CDC 602 (12/87)

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS

# MEMORANDUM

DATE : **MARCH 12, 2007**

TO : **INMATE HAWTHORNE, K67900, 3-EY-40**

FROM : SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94964

SUBJECT : **CDC 602 INMATE APPEAL (FORMAL LEVEL) CSQ-6-07-00779**
(LIVING CONDITIONS)

**APPEAL ISSUE:**

You stated that you were deprived of basic human needs such as sanitary toilet facilities out on the Walk Alone yard.

**ACTION REQUESTED:**

For you to be placed back to integrated yard 1 and 2.

**APPEAL RESPONSE:**

Per CCR, Title 15, Section 3084.5(F) (2), I conducted a personal interview with you, in my office' during our interview, you reiterated your concerns about the sanitary toilet facilities out on the Walk Alone Yard. And your medical condition (Grandma Seizure).
You indicated the concerns of proper medical treatment out on the yard.

**APPEAL DECISION**

Your 602 have been **PARTIALLY GRANTED** at the formal level. I'm denying your request for sanitary condition out on the yard. But I'm granting you to go to ICC for your request to go to Exercise Yard 1 or 2.

**CHU, A** Chu, A
**Correctional Sergeant**
**East Block Yard Sgt. 2/W**

3/16/07

GA-47-8

State of California                                          Department of Corrections and Rehabilitation

# Memorandum

Date:     April 23, 2007


To:       INMATE, HAWTHORNE, K67900
          California State Prison, San Quentin


Subject:  SECOND LEVEL APPEAL RESPONSE
          LOG NO.: SQ 07-779


APPEAL ISSUE:  CUSTODY/CLASS

ISSUE:

Whether or not the appellant is deprived of basic human needs (sanitary toilet facilities,
shelter from bad weather) when the appellant attends the Grade "A" walk alone exercise
yard.

FINDINGS I

The appellant filing this appeal alleges that he is being deprived of basic human needs
and is requesting to be placed back on his formerly assigned Integrated exercise yard #1
for the condemned population. The appellant requests a sink, toilet, running water and a
shower installed on each of the walk alone yards.

FINDINGS II

INTERVIEWED BY: CORRECTIONAL SERGEANT A. CHU

The first level reviewer partially granted the appellant's appeal by denying the request for
the upgraded sanitary conditions on the yard but granting you a return visit to the
Institutional Classification Committee (ICC) to evaluate your request for a change of
exercise yard.

REGULATIONS:  The rules governing this issue are:

**California Code of Regulations, Title 15, Section (CCR) 3270.
General Policy.**

**Enomoto V Thompson**

DETERMINATION OF ISSUES:

After review of the available documents, arguments having been presented, as well as
referenced regulations, appellant's appeal has been thoroughly considered.  Appellant is
advised that a thorough inquiry was conducted into his concerns.

On April 19, 2007, this reviewer interviewed C. Grant, Correctional Counselor I as well as conducted a review of the appellant's central file regarding this appeal. The following information and facts were determined during this inquiry:

Review of Appellant's central file revealed the appellant has not returned to ICC as previously granted on the first level. The appellant's custody was reduced to MAX A on February 1, 2007, following ICC. He was assigned to the Walk alone yard as a result of his refusal to be placed on any other yard. Inmates placed on the integrated yards must be compatible on that yard and must be compatible will all other Grade A inmates.

During the interview of C. Grant - CCI, it was discovered that due to administrative error, she was not aware of this partially granted appeal and that the appellant was to return to ICC for a yard review. The appellant is now scheduled to attend ICC on April 26, 2007, for a yard review.

On December 11–15, 2006, the Program Compliance Unit (PCU), Office of Audits and Compliance, conducted an audit of the condemned program. They utilized a review instrument based on the scope of the Thompson v. Enomoto Consent Decree. The standards and compliance review board found all East Block exercise yards to be in compliance. The program facilities and program accessibility were found to be in compliance within the scope of the audit.

Upon review of the documentation submitted, it is determined that the appellant's allegations have been thoroughly reviewed and evaluated at the First Level of Review. The documentation and arguments presented are persuasive that the appellant has not supported his appeal issue with sufficient evidence or facts to warrant a modification of the First Level Response. Based on the submitted documentation, by both the appellant and first level reviewer, as well as discussions, this reviewer finds that the appellant's issues have been duly addressed. The Second Level Response and the decision reached are based upon a reasonable penological interest. Therefore, based on the information received and reviewed the appellant's appeal is partially granted.

DECISION:

Based on the above review, appellant's appeal is partially granted. The appellant is advised that this issue may be submitted for a Director's Level of Review if desired.

**ROBERT L. AYERS JR., WARDEN**
California State Prison, San Quentin

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date: AUG 24 2007

In re: Hawthorne, K-67900
California State Prison, San Quentin
San Quentin, CA 94964

IAB Case No.: 0614880 Local Log No.: SQ 07-00779

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner S. Hemenway, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

I **APPELLANT'S ARGUMENT:** It is the appellant's position that he is deprived of basic human needs, and exposed to poor conditions and discomfort while on the "walk-alone" (WA) exercise yards at California State Prison, San Quentin (SQ). The appellant wants: to be placed back on his formerly assigned "integrated yard"; a sink, toilet, running water and shower installed in each WA Grade "A" Facility; and each WA facility be re-constructed with exercise equipment and as much sunlight as the larger Grade "A" yards.

II **SECOND LEVEL'S DECISION:** The reviewer found that the appellant was to be returned to Institution Classification Committee for re-evaluation for the appropriate exercise yard. On December 11-15, 2006, the Program and Compliance Unit, Office of Audits and Compliance, conducted an audit of the "Condemned" inmates' program. The program facilities and program accessibility were found to be in compliance within the scope of the audit. The appeal was granted in part at the Second Level of Review.

III **DIRECTOR'S LEVEL DECISION:** Appeal is denied.

A. **FINDINGS:** Director's Level of Review (DLR) found that, although the appellant feels there should be more amenities on the WA exercise yards, the exercise program for WA inmates is adequate. Due to the amount of exercise yards required for all inmates' safety, large yards had to be split into smaller yards to accommodate everyone. Inmates are informed of the conditions of the WA yards before they are placed on the yard, i.e. weather and lack of facilities. The WA inmates are given a choice to remain on the exercise yard for the duration of their allotted time (approximately three hours) or be allowed to exit the yard at their request. However, they are not allowed to return to that yard during that session (due to staff availability and time constraints). For the safety of staff and other inmates, no bags or cups are allowed on the exercise yards. Pursuant to laws and standards, the amount of light required per inmate and their occupied areas has been addressed and found to meet those standards. "Out-of-cell time" and yard access does not require the state to provide exercise equipment. The Condemned inmates' yards have been assessed and deemed adequate for inmates. The appeal is denied at the DLR.

B. **BASIS FOR THE DECISION:**
California Code of Regulations, Title 15, Section: 3270, 3272, 3375, 3375.1, 3375.2, 3376, 3377, 3377.1, 3380

C. **ORDER:** No changes or modifications are required by the institution.

HAWTHORNE, K-67900
CASE NO. 0614880
PAGE 2

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:   Warden, SQ
       Appeals Coordinator, SQ

**NAME:** Hawthorne **NUMBER:** K67900 **HOUSING:** 5-EB-013S
**CUSTODY:** Max **CS:**59 **WG/PG:**D2/D
**ASSIGNMENT:** Grade A East Block
**YARD ASSIGNMENT:** Gr A EB Reintegrated Mix #1

**NEXT COMMITTEE: 120 DAYS**

**Action:** Assign to Reintegrated Mix #1 Exercise Yard

**Committee Discussion:** Inmate Hawthorne made a personal appearance before Unit V, ICC for a Exercise Yard Review. Hawthorne is being referred to ICC for consideration of a Group Yard as previously discussed per his last ICC hearing and due to his appealing the issue per CDCR-602. Dr. A Andres, Staff Psychologist, stated that Hawthorne was not a participant in the MHSDS program per 128C dated 10/3/06 and that there were no mental health issues at this time. Hawthorne stated he received 72 hours prior notice of this hearing, understood why he was appearing, and could comprehend today's hearing proceedings. A staff assistant was not assigned for this hearing. Hawthorne stated he had no Reasonable Accommodation issues, was in good health and ready to proceed with today's hearing.

Hawthorne was previously assigned to a Grade A East Block Program but was not assigned to a Group yard as ICC had been given the impression that the Subject would not participate in any other exercise yard program. It was noted by ICC at this time that the yard the Subject was requesting was not exclusively made up of Crip associates and had returned to a more reintegrated status. Subject stated that he could program successfully program on any exercise yard, but preferred yard #1 as he was on that yard for eight years previous to being removed. ICC could find no reasons at this time to deny the Subject' request, and granted him placement on Reintegrated Mix #1 exercise yard.

**Committee Action:** After considering all case factors, ICC elects to retain Hawthorne in **East Block** at **Grade A**, continue WG/PG D2/D, and place him on **Grade A Reintegrated Mix #1Yard.** Hawthorne stated he understood today's ICC actions and was in agreement with their recommendation. Subject was advised of his right to appeal any and all of ICC's actions or decisions. This case will be re-evaluated in **120 days** by UCC as per normal program.

**Committee Members:** Robert L. Ayers Jr., Warden, D. Dacanay, Associate Warden, D. Edwards, CCII, J. Pickett, Facility Captain, Dr. A. Andres, Staff Psych.

Robert L. Ayers Jr., Warden
Chairperson

D. Edwards, CCII
Recorder

**DATE:4/26/07** **Classification:** ICC **San Quentin, SP**
**128G**

Exhibit #11

Carlos A. Hawthorne II K-679[illegible]
San Quentin State Prison
San Quentin, CA 94974

NORTH BAY CA 949 MAR 13 2008

USA 84

USA 41

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.20

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.19

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.18

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.17

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.05

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.04

$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.03

MAR
$0.41 0
US POSTAGE
FIRST-CLASS
062S0006116369
94707
C01195.02

United States DISTRICT COURT
Northern DISTRICT OF CALIFORNIA
450 Golden Gate Avenue
San Francisco, CALIF 94102

Legal Mail
Confidential

RECEIVED
MAR 14 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA